UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT ANTHONY BOJAJ,

    Petitioner,

v.

MARY BERGHUIS, *Warden*,

    Respondent.

Case No. 14-cv-12193
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS [1]**

On August 15, 2010, Petitioner Robert Bojaj drove drunk. He smashed into the back of Shelby Gunn's car at high speed. Gunn died but Bojaj survived and was charged with her death. A jury convicted Bojaj of, among other things, second-degree murder. Bojaj is presently serving a 15- to 25-year prison term on that conviction.

Bojaj petitions this Court for a writ of habeas corpus. His primary claim is that expert testimony that placed his driving speed at around 120 mph was based on an unreliable foundation and thus, should have been excluded from trial. The state trial court thought that its failure to hold a *Daubert* hearing on this issue deprived Bojaj of a fair trial. The Michigan Court of Appeals, however, disagreed. This Court cannot say that ruling is improper. For that and other reasons set out below, the Court will DENY Bojaj's petition for habeas corpus.

**I.**

**A.**

Although the following recitation of the facts are taken primarily from the Michigan Court of Appeals' opinion, *see* 28 U.S.C. § 2254(e)(1), it is supplemented by portions of the trial transcript, *see Wood v. Allen*, 558 U.S. 290, 293 (2010) (recognizing that it is unsettled whether

the deference owed to state-court factual findings under § 2554(e)(1) applies when the state court adjudicates a claim on the merits such that § 2254(d)(2) applies).

Around 1:30 a.m. on August 15, 2010, Bojaj, having consumed around 10 alcoholic beverages, sped down a Michigan highway in his Lexus. *People v. Bojaj*, No. 303884, 2012 Mich. App. LEXIS 2369, at *2 (Mich. Ct. App. Nov. 27, 2012). His blood alcohol level was three-times the legal limit. *Id.* at *4; Mich. Comp. Laws § 257.625(1)(b). Traveling well over the speed limit (precisely how fast is disputed) and swerving across lanes, Bojaj rear-ended Shelby Gunn's Dodge and then crashed into the left median. *Id.* Gunn died. *Id.* Bojaj survived and was charged with Gunn's death.

At Bojaj's criminal trial, several eyewitnesses testified about what they had observed. Debra Cooper, a passenger in a car Bojaj passed on the highway before the accident, thought that he had been driving "very fast, you know one hundred miles an hour" (R. 5, PID 603); she elaborated, "'I have seen cars go past me doing eighty miles an hour, ninety miles . . . . I have never had a car go past me as fast as this one had.'" *Id.* Cooper observed Bojaj's car "contact the rumble strips on the left side of the highway for three to five seconds before swerving to the rumble strips on the other side of the road and disappearing from sight." *Id.* at *3–4. Given how Bojaj was driving, Cooper was not surprised that an accident had occurred "'because anybody driving like that you could see it coming.'" *Id.* at *3.

Cooper's husband, who was driving, also testified to the speed of Bojaj's vehicle:

I drive a lot on the highways and to me I mean it seemed like [Bojaj's car] was [traveling] one hundred miles an hour. I mean I don't know for sure, but I mean it was very, very fast. It kind of to me it seemed like if you've ever, if you've ever had like a police, police officer pull out because they're like trying to catch somebody speeding and you're going seventy, seventy-five and they just zoom right by you because they're after somebody. It was at least as fast as that if not faster.

(R. 5, 633–34.)

Another eyewitness, Megan Ann Boehms, described Bojaj as "driving 'at a very high rate of speed' and 'swerving.'" *Id.* at *4. At trial, when the prosecutor noted that Boehms had told police that Bojaj had been driving around 90 to 100 mph, Boehms qualified her earlier statement by testifying that she was "not a good estimator." (R. 5, PID 665.) Paul Raukar testified that he was driving 70 mph and Bojaj was "going faster than me." (R. 5, PID 683.)

In addition to the eyewitnesses, several expert witnesses also offered their opinions on how fast Bojaj was driving when he collided with Gunn.

The prosecution's primary witness on the issue was Sergeant Kevin Lucidi, an expert in crash reconstruction. *Bojaj*, 2012 Mich. App. LEXIS 2369, at *5. Lucidi combined two methods to estimate Bojaj's speed. *See id.* The first method was based on a conservation-of-linear-momentum formula; it was "predicated on physically-measurable components including the coefficient of friction, vehicle weights, the distance the vehicles traveled post-impact, and the speed of the victim's vehicle." *Id.* Because the speed of Gunn's vehicle was unknown, Lucidi applied the method using several different assumed speeds (50, 60, or 70 mph). *Id.* at *6. Lucidi opined that the result of just the conservation-of-momentum method was that, on the low end, Bojaj had been driving in the range of 90 mph (meaning between 82 to 98) and, on the high end, in the range of 120 mph (meaning between 109 and 126 mph) when he hit Gunn. *Id.*

The second method Lucidi used was based on data obtained from an Event Data Recorder (EDR) retrieved from Bojaj's car. *Id.* In particular, the EDR contained a change in velocity, or "delta-v," number indicating that Bojaj's car underwent a 34 mile-an-hour change in velocity during the crash. *Id.* at *5. Based on the delta-v number, Lucidi opined that Bojaj's closing speed—how much faster he was traveling than Gunn when he approached her and struck her

3

from behind—was nearly 70 mph. (R. 5, PID 931.) Thus, if Gunn had been traveling between 50 and 60 mph when she was struck from behind, Bojaj's maximum speed at collision was somewhere in the range of 120 mph (meaning between 117 and 126). *Bojaj*, 2012 Mich. App. LEXIS 2369, at *6.

Lucidi then combined the two methods. He testified that certain speeds resulting from the conservation-of-momentum method were not consistent with the damage to the vehicles and a delta-v of 34. (R. 5, PID 937–38.) For example, he could eliminate the possibility that Gunn was driving 70 mph and Bojaj 109 mph under the conservation-of-momentum method because a 39 mph closing speed would not have produced a delta-v of 34 or correspond to the 70 mph closing speed he had determined based on that delta-v. (*See* R. 5, PID 938.) Lucidi ultimately told the jury that, given the 70 mph closing speed based on the delta-v, he thought Bojaj had been driving between 117 and 126 mph. (R. 5, PID 939.)

The prosecution also called Mark Jakstis, an expert from Toyota (the manufacturer of Bojaj's Lexus), to testify about the EDR. "Jakstis described the Lexus's EDR as 'part of the airbag system,' with the capability of recording certain information during a 'trigger event' such as a crash." *Bojaj*, 2012 Mich. App. LEXIS 2369, at *4. According to Jakstis, "[t]he EDR stores information acquired milliseconds before an accident, including the vehicle's speed, the engine speed, the accelerator pedal position, and the driver's brake use." *Id.* The EDR recovered from Bojaj's car showed that the last recorded speed was 78.3 mph, which Jakstis described as the maximum speed that the EDR could record. *See id.* "The EDR reported that the accelerator was 'in the mid position,' which meant that the driver was 'pushing down on the accelerator a bit' and 'still accelerating' at the time the EDR stopped recording data." *Id.*

4

On cross, Jakstis admitted that the tool used to read data from the EDR (the EDR itself is like a black box) was merely a prototype. (R. 5, PID 873.) In fact, the jury heard that in another case, Jakstis had said, "The read out tool has never been validated as a reliable device to accurately convert the data contained in this EDR to the form presented in the read out report." (R. 5, PID 894–95.) Jakstis further "conceded that Toyota designed the EDR 'to look at the performance of an airbag system in a crash' rather than to aid law enforcement after an accident." *Bojaj*, 2012 Mich. App. LEXIS 2369, at *5. He acknowledged that the EDR system was not infallible and there could be "anomalies" and described situations, such as a loss of power to the EDR, where the EDR might not capture data. (R. 5, PID 839–40.) But, Jakstis asserted, with respect to the EDR from Bojaj's car, there were "no anomalies." (R. 5, PID 908.) And Jakstis affirmed that the delta-v value from the EDR appeared to be accurate and reliable. (R. 5, PID 908–09.)

Bojaj called his own accident-reconstruction expert, Larry Petersen, to testify about how fast Bojaj had been traveling. "Petersen criticized several of the assumptions built into Lucidi's calculations. For example, Petersen estimated that the front end of [Bojaj's] Lexus contacted 50% of the rear of [Gunn's] Dodge, while Lucidi believed the overlap percentage to have been 80%." *Bojaj*, 2012 Mich. App. LEXIS 2369, at *6–7. Based on what Petersen thought were the correct assumptions about the accident, he opined that Bojaj had been driving between 85 and 97 mph when he struck Gunn. *Id.* at *7. Petersen also testified that if Gunn had been driving 50 mph, and Bojaj 98 mph, the closing differential of about 50 mph would get "in the neighborhood" of producing a delta-v of 34 (the delta-v value from Bojaj's EDR). (R. 5, PID 1086–87.)

Having heard this and other testimony, the jury convicted Bojaj of operating a vehicle while intoxicated causing death and—as more significant for present purposes—second-degree murder. *Id.* at *8.

### B.

Bojaj moved for a new trial. One of his arguments was that the trial court had erred in denying his pre-trial motion for a *Daubert* hearing on the issue of whether the EDR data was reliable (or, perhaps more precisely, that Lucidi's testimony based on the EDR data was reliable). *See Bojaj*, 2012 Mich. App. LEXIS 2369, at *7–8.

The trial court agreed with Bojaj: "You know without the excessive speed in this matter, and we had testimony that it was one hundred and twenty miles an hour. There just wouldn't be a Second Degree Murder in this case. Speed—There are all of these other factors, but when it comes back down to it speed is the proverbial eight hundred pound gorilla in this case." (R. 5, PID 1328.) Accordingly, the trial court granted Bojaj's motion for a new trial.

Both Bojaj and the prosecution appealed. The prosecution claimed that the trial court had abused its discretion in granting Bojaj a new trial. *Bojaj*, 2012 Mich. App. LEXIS 2369, at *8. In responding to the prosecution's appeal, Bojaj argued that the trial court had erred in failing to hold a *Daubert* hearing and that the "admission of the EDR data constituted a violation of due process because it rendered the trial fundamentally unfair[.]" (R. 5, PID 1595.) As for Bojaj's appeal, he argued that (1) there was insufficient evidence to support a second-degree murder conviction, (2) that prosecutorial misconduct deprived him of a fair trial, and (3) that his trial counsel had been constitutionally ineffective in failing to adequately pursue a motion to suppress the results of his blood-alcohol testing. (R. 5, PID 1468.)

The Michigan Court of Appeals concluded that the trial court abused its discretion in granting a new trial and rejected all three of Bojaj's grounds for appeal. *See Bojaj*, 2012 Mich. App. LEXIS 2369, at *8–14. Although the state appellate court agreed that the trial court should have held a *Daubert* hearing, it thought the error was "nonconstitutional" in nature, and thus demanded that Bojaj show that it was more likely than not that admitting the EDR data was outcome-determinative. *Id.* at *13. And, given the other evidence of guilt, the Michigan Court of Appeals found that "any impropriety in admitting the EDR data did not undermine the reliability of the verdict." *Id.* at *14.

This petition for habeas corpus followed. Bojaj raises four claims: the three he raised on appeal to the Michigan Court of Appeals and a claim that the Michigan Court of Appeals unreasonably concluded that admission of the EDR-based evidence was harmless. (R. 1, PID 29, 38, 47, 54.)

## II.

### A.

The Court addresses first Bojaj's claim that he was deprived of constitutional due process because the trial court permitted testimony based on EDR data.

### 1.

Before getting to the merits of this claim, the Court must decide if the Antiterrorism and Effective Death Penalty Act's highly-deferential standard of review should apply. If the Michigan Court of Appeals adjudicated Bojaj's due-process claim "on the merits" then AEDPA deference would kick in. *See* 28 U.S.C. § 2254(d). On the other hand, if the Michigan Court of Appeals did not adjudicate the merits of Bojaj's due-process claim, this Court would address that claim *de novo*.

A review of the Michigan Court of Appeals' opinion suggests that *de novo* review of the due-process claim is proper. To be sure, when a federal claim has been presented to the state court, this Court is to presume that the court adjudicated that claim on the merits—even if the state court offered no explanation for rejecting the federal claim. *Johnson v. Williams*, — U.S. —, 133 S. Ct. 1088, 1094, 185 L. Ed. 2d 105 (2013). But a presumption is just that—in appropriate cases it may be rebutted. *See id.* at 1096–97. This is arguably one of those cases. In particular, it appears that the Michigan Court of Appeals simply cast the failure to hold a *Daubert* hearing as "nonconstitutional" error without ever saying why there was no due-process violation: "The alleged error in this case—the admission of expert testimony based on a potentially inadmissible foundation—qualifies as preserved nonconstitutional error." *Bojaj*, 2012 Mich. App. LEXIS 2369, at *13. Perhaps an argument could be made that the Michigan Court of Appeals had—silently—concluded that the absence of a *Daubert* hearing "qualifie[d]" as nonconstitutional error *because* that error was not severe enough to rise to a constitutional due-process violation. Although the Court thinks this a somewhat strained reading of the appellate court's opinion, it is not an implausible one.

Given that it is not clear whether the Michigan Court of Appeals adjudicated the due-process claim "on the merits," that no party has briefed the issue, and that it ultimately makes no difference in whether this Court will grant Bojaj habeas corpus relief on this claim, the Court will assume, without deciding, that § 2254(d) does not apply to Bojaj's due-process claim.

**2.**

"[D]ue process is violated, and thus habeas relief warranted, only if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness." *Ege v. Yukins*, 485 F.3d 364, 375 (6th Cir. 2007) (internal quotation marks omitted). "Whether the admission of prejudicial

8

evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material in the sense of a crucial, critical highly significant factor." *Id.*

Bojaj claims that the admission of the data from the EDR recovered from his vehicle, in particular the delta-v value, and Lucidi's testimony based on the delta-v value, deprived him of due process. The Court disagrees: the admission of Lucidi's testimony was not "so egregious that it result[ed] in a denial of fundamental fairness," *Ege*, 485 F.3d at 375.

To be sure, the reliability of the delta-v value was not beyond reproach. As the state trial court pointed out in granting a new trial, the EDR was not infallible, the tool to read the data from the EDR was a prototype, and EDRs were not developed to record speed but to assess airbag performance. (R. 5, PID 1590.) Further, according to the trial court, Toyota's manual on EDRs stated, "'The accuracy of the memory of the Toyota's Event Data Recorder is still being validated and the read out tool for the EDR is still in the prototype stage. Toyota cannot verify the complete reliability of such information unless such data can be independently corroborated.'" (R. 5, PID 1590.)

On the other hand, the testimony was that the particular delta-v recovered from Bojaj's EDR was reliable. Jakstis—who no one disputes is qualified to give expert testimony about the functioning of the EDR—testified that there were "no anomalies" with the EDR from Bojaj's car and that the delta-v value from the EDR appeared to be accurate and reliable. (R. 5, PID 908–09.)

Thus, this is not the case where the data was obviously untrustworthy such that expert testimony based on that data should have undoubtedly been excluded under *Daubert*. *Cf. Ege v. Yukins*, 485 F.3d 364, 373 (6th Cir. 2007) (finding due-process violation where prosecution expert's testimony was "complete bunk," a state prosecutor's office had deemed the expert to be

9

a charlatan, and where the expert's testimony significantly contributed to the prosecution's decision to try the defendant).

And even granting that the delta-v value and corresponding testimony should have been excluded under *Daubert*, there were a number of factors that substantially reduced the prejudice of its admission.

First, the jury heard how the delta-v might be unreliable. Save for the statement in the Toyota manual, the jury heard, through the cross-examination of Jakstis, each of the reasons that the state trial court questioned the delta-v. In particular, Jakstis admitted before the jury that the tool used to read data from the EDR was merely a prototype (R. 5, PID 873); that in another case he averred as much (R. 5, PID 894–95); that "Toyota designed the EDR 'to look at the performance of an airbag system in a crash' rather than to aid law enforcement after an accident," *Bojaj*, 2012 Mich. App. LEXIS 2369, at *5, and that the EDR system was not infallible and there could be "anomalies" (R. 5, PID 839–40). With this information, the jury had ample basis to discount Lucidi's testimony based on the delta-v value.

Second, Bojaj was able to counter Lucidi with his own expert. In particular, Petersen testified that Bojaj had been driving between 85 and 97 mph when he struck Gunn. And he testified that the high end of his estimate, coupled with an assumption that Gunn was driving 50 mph, would have meant that Bojaj was closing in on Gunn at a speed that could produce a delta-v close to the delta-v read from Bojaj's EDR. (R. 5, PID 1086–87.)

Third, expert testimony was not the only evidence the jury heard about Bojaj's excessive speed. At least three eyewitnesses thought that Bojaj was driving in the range of 100 mph.

On the issue of prejudice, most troubling is that the primary battle at trial was whether Bojaj should be convicted of second-degree murder or a lesser offense and that Bojaj's excessive

10

speed was a significant part of the prosecution's claim that Bojaj had the state of mind for second-degree murder (i.e., that Bojaj "knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of his actions" (R. 5, PID 1190)).

But even this prejudice was tempered. In particular, the prosecutor made clear to the jury that there were multiple reasons for it to find that Bojaj possessed the state of mind for second-degree murder. She pointed out that Bojaj had the equivalent of 10 or so drinks before getting behind the wheel of a powerful car. (R. 5, PID 1147.) And that Bojaj had ignored warnings from the highway's rumble strips: "Think about three to four seconds hearing that. That's a safety. You know why [the rumble strips are] there? That's for purposes of safety. That's there to tell you listen, idiot. Get off the road. Listen, idiot. Stop this car." (R. 5, PID 1145.) She also asked the jury to consider Bojaj's swerving: "we're talking about three lanes of traffic. So he went from left to right back to left again[.]" (R. 5, PID 1146.) And the prosecutor summarized these several factors this way:

> [W]e have so much more than just . . . gross negligence, ladies and gentlemen. Because driving a car even at a .08 alcohol level you can say that that's gross negligence. Speeding over 100 miles an hour by itself you can say that that's gross negligence. Erratic driving all over the road you can say that that's gross negligence. Smashing into the back of the car. Well, I don't think I can say that that's gross negligence. Smashing into the back of the car at 70 miles an hour without stopping or at a closing speed of 70 miles, I can't say that that's gross negligence in and of itself. Some of those other ones in and of themselves you might find that that's just gross. Yeah, he was just a little grossly negligent. *But when you put them altogether, when you put them altogether* with smashing into the back of the car and a closing speed of 70 with a .2 intoxication, with the careless driving, with him weaving all over the road. Put all of that together ladies and gentlemen, that's what we're talking about here. Circumstances that are so egregious, circumstances that are such that Ms. Gunn just didn't stand a chance. That's what we're talking about here. She didn't have a chance to walk away from this thing. And that's why it's Murder in the Second Degree and not just Manslaughter.

(R. 5, PID 1151–52 (emphasis added).) So it was not just speed upon which the prosecution's second-degree murder case hinged.

In sum, state rules of evidence are the primary safeguard against unreliable expert testimony being put before the jury and the Due Process Clause serves as a distant backstop to these rules. *See Dowling v. United States*, 493 U.S. 342, 352 (1990) ("The question . . . is whether it is acceptable to deal with the [harm from the admission of Henry's testimony] through nonconstitutional sources like the Federal Rules of Evidence, or whether the introduction of this type of evidence is so extremely unfair that its admission violates 'fundamental conceptions of justice.'"); *Patterson v. New York*, 432 U.S. 197, 210 (1977) ("Traditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch."). Bojaj is entitled to a new trial only if Lucidi's testimony based on the delta-v resulted "in a denial of fundamental fairness." *Ege*, 485 F.3d at 375. And, as explained, the admission of the delta-v and corresponding testimony was simply not that egregious: testimony indicated that the delta-v in this particular case was reliable, the jury heard why, generally, it might not be reliable, Bojaj countered the prosecution's expert with his own, there was non-expert testimony about excessive speed, and excessive speed was not the only reason the prosecution urged the jury to convict Bojaj of second-degree murder. Accordingly, Bojaj's due-process claim does not warrant habeas corpus relief.[1]

---

[1] The Court has followed the framework used in *Ege* and answered the question of whether the admission of Lucidi's testimony based on the delta-v deprived Bojaj of a fundamentally fair trial. In his petition, Bojaj hints at a two-step inquiry: (1) whether there was a constitutional violation, and (2) whether that violation was harmful under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). (R. 1, PID 34–38); *see also* Brian R. Means, Postconviction Remedies § 33:3 ("If the petitioner meets his burden of demonstrating that the erroneous evidentiary ruling violated his due process rights, he must further demonstrate that the constitutional error had a

12

**B.**

Bojaj also claims that his petition should be granted because of the prosecutor's improper remarks during closing arguments.

In particular, Bojaj's counsel stressed that by charging murder, the prosecution had sought the most severe conviction:

> The government has great powers. The Prosecutor's Office has great powers, and with that great power to charge, to decide what somebody is going to be standing trial for comes with it great responsibilities. They've decided to charge with the highest possible penalty per a case you can charge. Hold her to that. Hold her to that and make sure she's telling you the truth as to what the law and the facts are in this case before you render a verdict. I beg you to do that.

(R. 5, PID 1160–61.)

The prosecutor responded,

> MS. SIRINGAS [Prosecutor]: . . . . My job is to present the evidence whatever it is. If it's compelling then it's compelling. If it's less egregious than it is, so be it. But whatever it is that's what each of us has a job. And as prosecutors we do lodge charges against defendants. . . . The prosecutor *who knows the law* issues charges. *But are we alone in this judicial system? Do we act un-checked, do we act independently? Can we just file anything?*
>
> And he keeps talking about the highest charge that could be leveled against somebody. You know what the highest charge is? Murder in the First Degree. That's the highest charge. That's premeditated intent to kill deliberate. That's the highest charge. Is this a Murder charge? Yes, it is. Does the law allow it? Yes, it does. If the facts that we've presented here did not sustain that, enough evidence to bring it to you, ladies and gentlemen, because you ultimately make the final

---

substantial and injurious effect on the verdict." (citing cases)). But even if this two-step framework is proper, the Court would still not grant Bojaj habeas relief because the Court neither has "grave doubt," *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995), that Lucidi's testimony based on the delta-v value "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. 619, 637 (1993), nor believes that there is a "reasonable probability" of a different outcome without Lucidi's testimony based on the delta-v, *Kyles v. Whitley*, 514 U.S. 419, 435–36 (1995). The testimony of Bojaj's own expert was that, with a blood alcohol level three times the legal limit and while swerving in and out of traffic, Bojaj was traveling 85 to 97 miles per hour. Additionally, there was no challenge to Lucidi's conservation-of-momentum method which placed Bojaj's speed at 90 mph on the low end and 120 mph on the high end.

decision. *If that was not allowed the Judge sits here and he wouldn't let you decide something that the law does not allow for you to decide.*

MR. BERNIER [Bojaj's Counsel]: Your Honor, I'm going to object to that--

MS. SIRINGAS: He, he said I get to make the charging decisions, and *he knows there's a probable cause hearing* where the--

MR. BERNIER: Your Honor, Your Honor, Your Honor--

MS. SIRINGAS: There's all kinds of--

MR. BERNIER: Your Honor, Your Honor--

THE COURT: Stop, stop, and stop. That's it.

MR. BERNIER: Thank you.

THE COURT: Move on to your next argument.

MS. SIRINGAS: Thank you.

(R. 5, PID 1174–75 (emphases added).)

Bojaj says that by making the emphasized statements, the prosecutor "improperly argued that the murder charge had judicial oversight, approval and support, something not in evidence, and which improperly infringed and usurped the jury's role in deciding the case." (R. 1, PID 53.)

For a prosecutor's remarks to rise to the level of a constitutional violation, it must be that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168 (1986). Because the Michigan Court of Appeals decided the merits of this claim and applied the *Darden* standard, *see Bojaj*, 2012 Mich. App. LEXIS 2369, at *24–25, for Bojaj to prevail it must be that the Michigan Court of Appeals' adjudication of the prosecutorial misconduct claim "resulted in a decision that was contrary to, or involved an unreasonable application of" *Darden* or "resulted in a decision that was based on an unreasonable determination of the facts[.]" 28 U.S.C. § 2254(d). Moreover, because "the *Darden* standard is a very general one," the Supreme Court has reminded federal habeas courts that state courts have leeway in applying it. *Parker v. Matthews*, — U.S. —, 132 S. Ct. 2148, 2155, 183 L. Ed. 2d 32 (2012). Thus, the question before the Court is not whether it agrees with Bojaj that the

prosecutor's remarks were improper, but whether the Michigan Court of Appeals reasonably applied *Darden*'s general standard.

The answer is "yes." First, the Michigan Court of Appeals reasonably concluded that Bojaj's counsel had made an argument "concerning the government's 'great power' to make charging decisions, inaccurately asserting that defendant had been charged with the highest crime possible under the law." *Bojaj*, 2012 Mich. App. LEXIS 2369, at *25. And while this Court might interpret Bojaj's counsel's argument differently, there is nothing unreasonable about the state court's finding that Bojaj's counsel had "urged that the prosecutor had misused her power by overcharging defendant." *Id.* The Michigan Court of Appeals continued: "In response, the prosecutor accurately explained the charging process, albeit in a shorthand fashion, and correctly refuted that defendant had been charged with the 'highest' possible crime. Because the prosecutor's remarks constituted a fair response to defense counsel's arguments and contained no misrepresentations, we find no prosecutorial misconduct." *Id.* This too was reasonable. The Supreme Court has recognized that the prejudice from a prosecutor's improper statements must be assessed in context of defense counsel's initial attack. *United States v. Young*, 470 U.S. 1, 11, 18–19 (1985). Moreover, the prosecutor's statement was true, it was cut off by objection, and it played but a small role in her closing argument (and a miniscule one in the entire trial).

In short, the Court cannot say the Michigan Court of Appeals' unreasonably applied *Darden*. It follows that Bojaj's prosecutorial-misconduct claim does not clear § 2254(d)'s bar to habeas corpus relief.

## C.

Bojaj next claims that he is entitled to a writ of habeas corpus because his trial counsel was constitutionally deficient. (R. 1, PID 54.) In particular, Bojaj asserts that his counsel only

15

half-heartedly pursued a motion to suppress the results of his blood-alcohol testing. Bojaj insists that the motion was meritorious because (1) after the crash, paramedics had deemed him not oriented to time or place so it was impossible for him to have knowingly consented to testing (R. 1, PID 54, 59), and (2) although, under Michigan law, those arrested for certain driving offenses have impliedly consented to testing, he was not under arrest at the time he was advised of his chemical-testing rights (R. 1, PID 60).

The Court has difficulty understanding the significance of Bojaj's claim that he was not under arrest *at the time he was advised of his chemical-testing rights*. (R. 1, PID 60.) Michigan law says that a person who is arrested for certain driving-while-intoxicated offenses "is considered to have given consent to chemical tests of his or her blood . . . for the purpose of determining the amount of alcohol." *See* Mich. Comp. Laws § 257.625c(1). And Bojaj does not claim that he was not under arrest for causing death while operating a vehicle while intoxicated *at the time his blood was taken*.

Perhaps Bojaj's point is that, only after a drunk driver is arrested for an offense listed in § 257.625c(1), is the driver read a number of rights, including this one: "If he or she refuses the request of a peace officer to take [a chemical test of his or her blood], a test shall not be given without a court order, but the peace officer may seek to obtain a court order." Mich. Comp. Laws § 257.625a(6)(b)(iv). But Bojaj makes no developed argument that the failure to read this right after arrest, as opposed to shortly before, negates the implied consent stemming from the arrest.

Finally, Bojaj's claim that he was not under arrest at the time he was read his chemical test rights is contrary to what the Michigan Court of Appeals concluded, and upon a review of the preliminary-examination transcript, the Michigan Court of Appeals' finding is supported by the record. (*See* R. 5, PID 239–40 (Officer Shulman's testimony that he arrested Bojaj when he

16

secured him to the gurney); R. 5, PID 247 (Trooper Hinojosa's testimony that he read the statement "you are under arrest for the offense of operating a vehicle while under the influence of an alcoholic liquor" to Bojaj in the course of reading the chemical-test rights).) As such, the Court cannot say that the Michigan Court of Appeals' factual determination was "unreasonable." *See* 28 U.S.C. § 2254(d)(2).

### D.

Lastly, the Court addresses Bojaj's claim that there was insufficient evidence to support a second-degree murder conviction. The governing legal standard coupled with the facts recounted above all but resolve this claim.

If this were direct review, Bojaj would have to clear a high hurdle: evidence sufficiently supports a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact *could* have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphases added). But this is collateral review and the Michigan Court of Appeals applied *Jackson*'s standard and adjudicated Bojaj's sufficiency-of-the-evidence claim on the merits. *See Bojaj*, 2012 Mich. App. LEXIS 2369, at *17–21. So the bar is even higher: did the Michigan Court of Appeals unreasonably conclude that at least one reasonable jury could have convicted Bojaj of second-degree murder? *See* 28 U.S.C. § 2254(d)(1).

As for what the Court has already said, many pieces of evidence supported the *mens rea* for second-degree murder ("knowingly creat[ing] a very high risk of death or great bodily harm knowing that death or such harm would be the likely result" (R. 5, PID 1190)): expert and lay testimony about excessive speed, swerving, ignoring the warnings from rumble strips, and getting behind the wheel with a blood-alcohol level more than three times the legal limit.

Bojaj counters this evidence by pointing out that he was driving at a time when the road was not crowded, that no one knows how fast Gunn was driving, and that, as a general matter, far less than one percent of all drunk drivers end up killing another driver. (R. 1, PID 34–35.)

At most Bojaj's evidence makes the *Jackson* question debatable, but if it is debatable, the Michigan Court of Appeals was not unreasonable in resolving it the way it did. Thus, § 2254(d) precludes this Court from granting habeas corpus relief on Bojaj's insufficient-evidence claim.

### III.

For the foregoing reasons, the Court DENIES Bojaj's petition for habeas corpus. (R. 1.) But the Court will GRANT Bojaj a certificate of appealability on all aspects of his claim that the admission of EDR data and testimony based on that data deprived him of constitutional due process. The Court denies Bojaj a certificate of appealability on all other claims, as the Court does not believe that reasonable jurists could dispute this Court's rejection of those. *See Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).

SO ORDERED.

                              s/Laurie J. Michelson
                              LAURIE J. MICHELSON
                              UNITED STATES DISTRICT JUDGE

Dated:  August 29, 2016

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 29, 2016.

                              s/Jane Johnson
                              Case Manager to
                              Honorable Laurie J. Michelson